UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ZECHARIAH ESCALANTE, individually, and LYNNDA ESCALANTE, individually, | Case No. C14-5774RBL |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | DKT. #37 |
| CITY OF TACOMA, a political subdivision of the State of Washington; DONALD ROSE; STEVEN MILLER; and JOHN DOES 1-5, | |
| Defendants. | |

## I.    SUMMARY

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment [Dkt. #37]. The case involves an allegedly improper investigatory stop and restraint of sixteen-year-old Plaintiff Zechariah Escalante, who did not match witnesses' descriptions of an armed man sought by Defendant police officers Donald Rose and Steven Miller. Witnesses reported that a young woman had given a gun to a "shirtless, bald man" involved in a fight in Oakland Park, before he drove off in a light-colored two-door car. Rose observed a woman potentially matching a 9-1-1 caller's description enter a dark four-door near the park. He ordered all passengers out of the vehicle. Zechariah, who wore a shirt and dreadlocks, looked at Rose, who

ORDER
PAGE - 1

interpreted the look as a "target glance," indicating to him that Zechariah would flee or fight. Rose initiated a straight arm bar takedown. Miller assisted and tased Zechariah at least once.

Zechariah (and his mother, Lynnda)[1] sued, claiming Rose and Miller violated his federal and state constitutional rights when they seized him without reasonable suspicion of criminal activity and used excessive force in bringing him to the ground and restraining him.[2] Escalante also asserts state law negligence claims against Rose, Miller, and the City of Tacoma. The Defendants seek summary judgment on all claims, arguing their seizure and subsequent treatment of Zechariah did not violate his federal constitutional rights, and that even if they did, the officers are entitled to qualified immunity. They seek summary judgment on Escalante's Washington State Constitution claims because a claim for money damages under it is not cognizable. They seek dismissal of his negligence claims, arguing they are barred by the public duty doctrine and an absence of evidence.

## II.    BACKGROUND

On October 2, 2011, two 9-1-1 callers reported a "shirtless, almost bald black man" running around Oakland Park with a gun. The first caller, who identified himself, described a black man between the ages of eighteen and nineteen, five foot ten, around 145 pounds. The second caller did not identify herself. She reported that man and seven other individuals got into a "brand new gray car."  She also reported that a black, seventeen-year old woman handed the gun to the man. She was of slender build, medium height, wearing a black jacket, blue jeans, and black shoes with blue trim.

---

[1]      This Order will refer to the Plaintiffs as Escalante in the singular for clarity.

[2]      Plaintiffs also named several unidentified police officers (John Does 1-5) as defendants. They did not identify the officers by the February 27, 2015 deadline for joinder. Defendants' Motion for Summary Judgment as to the unnamed defendants is therefore **GRANTED**.

ORDER
PAGE - 2

Defendant Rose and his partner, Clark, responded to the calls. Dispatch notified them that the armed man had driven off in a gray two-door car.  They began to look for people who may have been involved in the altercation reported by the 9-1-1 callers.  They noticed two young, black women walking away from the park. One of the women appeared to match the description of the woman who had reported delivered the gun, but Rose and Clark did not contact the women at that time.  Instead, they spoke to a witness who reported that several shirtless people involved in a "large brawl" in the park had left the scene in four vehicles.

Rose and Clark saw the two women getting into a brown four-door vehicle, and approached. Zechariah's older brother, Curtis, was driving, and Zechariah was sitting in the passenger seat. Neither matched the description of the shirtless, almost bald man.  Zechariah was five-foot-eight, 130 pounds, had a slight build, was fully dressed, and had braided dreadlocks—not "almost bald."   Rose and Clark surrounded the car, and Defendant Miller and other officers arrived on the scene. With his gun drawn, Rose ordered the occupants out of the car.  The two women and Curtis got out, and were handcuffed and placed in the back of patrol cars without incident.  Zechariah was the last to exit.

Zechariah claims Rose ordered him to "kneel," which he did, after glancing back to look at Rose. Rose claims he ordered Zechariah to get on his knees multiple times, and because Zechariah didn't, he perceived Zechariah's look as a "target glance"—a look given by detainees who plan to flee or fight. Rose grabbed Zechariah' right arm and initiated a "straight arm bar takedown," which Zechariah resisted by attempting to move his arms toward his torso. Rose contends he held onto Zechariah's right arm, while other officers took control of his left arm, because he was concerned Zechariah had a weapon. Miller then performed a knee strike on Zechariah's right ribcage. Zechariah alleges he was already on his knees, with his hands on

ORDER
PAGE - 3

the back of his head, when Rose slammed him down on the pavement and kicked and kneed him before handcuffing him. Zechariah recalls that Miller tased him repeatedly, without warning, near his groin. Miller claims he tased Zechariah only once.  In any event, the officers called for medical assistance and arrested Zechariah for obstruction and, after a search, for possession of marijuana[3]. There was no gun in the car.

Escalante sued, claiming Rose and Miller's unlawful investigatory stop and use of excessive force violated his constitutional rights.  He also asserts two state law claims: (1) Rose and Miller engaged in an unreasonable search and seizure and used excessive force against him in violation of Article I, Section 7 of Washington State's Constitution, and (2) Defendants were negligent in their performance of an investigatory stop and use of improper physical force.

Rose, Miller, and the City[4] seek summary judgment on all claims.

### III.    DISCUSSION

### A. Standard of Review.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986). When ruling on

---

[3]    Escalante was tried on both charges, and convicted of possession. His conviction was overturned in a published opinion holding that the search was not valid, because the 9-1-1 calls were not reliable. *See State v Z.U.E*, 315 P.3d 1158 (Wash. App. 2014) The Washington Supreme Court affirmed. 352 P.3d 796 (2016).
    The Defendants argues that these holdings are of little moment because the Washington State Constitution is more protective than is the Fourth Amendment to the United States Constitution—maintaining that the officers' conduct was permissible under the later as a matter of law, even if it was not permissible under the former.  The Court does not agree that the gap is so large that the officers' conduct fell so obviously in it.

[4]    Escalante's complaint refers to an unconstitutional practice of racial profiling, but it does not specifically assert a *Monell* claim, and his Summary Judgment Response does not address this claim or provide any evidence in support of it. If and to the extent Escalante asserts a *Monell* Claim against the City of Tacoma, the motion for summary judgment on that claim is **GRANTED** and it is **DISMISSED**.

ORDER
PAGE - 4

summary judgment, courts do not weigh evidence to determine the truth of the matter, but "only determine whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Fed. Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)). Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

Courts must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252

## B. Qualified Immunity.

Escalante asserts §1983 claims against Rose and Miller for violating his right to be free of unreasonable searches and seizures when they stopped the vehicle, and for violating his right to be free from the use of excessive force.  The officers deny they violated Escalante's rights, and claim they are entitled to qualified immunity even if they did.

Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of the doctrine is to "protect officers from the sometimes 'hazy border' between excessive and acceptable force." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533

ORDER
PAGE - 5

U.S. 194, 206 (2001)). A two-part test resolves claims of qualified immunity by determining whether plaintiffs have alleged facts that "make out a violation of a constitutional right," and if so, whether the "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 553 U.S. 223, 232 (2009).

Qualified immunity protects officials "who act in ways they reasonably believe to be lawful." *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011) (quoting *Anderson*, 483 U.S. at 631). The reasonableness inquiry is objective, evaluating 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Huff v. City of Burbank*, 632 F.3d 539, 549 (9th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Even if the officer's decision is constitutionally deficient, qualified immunity shields her from suit if her misapprehension about the law applicable to the circumstances was reasonable. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Qualified immunity "gives ample room for mistaken judgments" and protects "all but the plainly incompetent." *Hunter v. Bryant*, 502 U.S. 224 (1991).

## C. *Terry* Stop Claim.

Rose and Miller claim they conducted a permissible "*Terry* stop" based on the 9-1-1 calls and their own observations. Escalante claims there was no reasonable basis for stopping the car, pointing in part to the Washington opinions holding just that.

Police officers may conduct brief investigative stops as long as, based on the "totality of the circumstances," there is a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). The reasonable suspicion needed to conduct an investigatory stop depends on the content of the

information police have at the time, as well as the degree of reliability of that information.

*Alabama v. White*, 496 U.S. 325, 330 (1990). Reasonable suspicion can be founded on

anonymous tips and 9-1-1 calls as long as they exhibit "sufficient indicia of reliability" to justify

an investigatory stop. *See id.* at 332 (anonymous tip, corroborated by independent police work,

contained "sufficient indicia of reliability" to justify investigatory stop). But anonymous tips, by

themselves, "seldom demonstrate the informant's basis of knowledge or veracity." *Navarette v.*

*California*, 134 S. Ct. 1683, 1688 (2014). Even if they are sufficiently reliable, telephone tips

only justify investigatory stops if they "create reasonable suspicion that 'criminal activity may be

afoot.'" *Id.* at 1690 (*quoting Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

      Rose and Miller's motion necessarily depends on the reliability of the 9-1-1 calls. They

claim the calls had sufficient indicia of reliability because: (1) one of the callers gave his full

name; (2) both callers provided similar information about the fight at Oakland Park; (3) the

callers' information about the Oakland Park fight was corroborated by a witness interviewed by

Rose and Clark; and (4) Rose and Clark observed a young woman who appeared to match the

description given by the anonymous 9-1-1 caller near the park.

      Escalante argues the calls did not give Rose and Miller a particularized and objective

basis for suspecting the occupants of the Escalante vehicle of past, ongoing, or future criminal

activity**.** Only the woman's description matched; the callers' descriptions of the number of

occupants, and the then-possessor of the gun, did not. There was no information from anyone

that anyone in the car (still) had a gun.

      Anonymous 9-1-1 calls have been deemed reliable where the caller is the actual victim

of, or has first-hand knowledge of, an ongoing emergency situation. *Navarette*, 134 S. Ct. at

1689; *United States v. Edwards*, 761 F.3d 977, 984-85 (9th Cir. 2014); *United States v. Terry-*

ORDER
PAGE - 7

*Crespo*, 356 F.3d 1170, 1176-77 (9th Cir. 2004). The 9-1-1 system itself supports callers' reliability, because law enforcement officials can trace and identify a call, thus exposing callers to potential legal sanctions, and thereby limiting the likelihood of false reports. *Navarette*, 134 S.Ct. at 1689-90; *Terry-Crespo*, 356 F.3d at 1689. However, calls involving general criminality, such as a minor's possession of a firearm, may not, absent other indicia of reliability, support a finding of reasonable suspicion. *Florida v. J.L.*, 529 U.S. 266 (2000) (finding anonymous tip concerning a minor's possession of a weapon not reliable where caller did not explain his basis of knowledge or provide predictive information for police officers to corroborate).

A reasonable jury could conclude that the 9-1-1 calls relied upon by Rose and Miller were not reliable enough to justify an investigatory stop under these standards. The callers' information did not indicate that any of the Escalante vehicle occupants was involved in the Oakland Park fight. None of the car's occupants matched the description of the armed man reported by the first caller.  And the anonymous caller reported that the armed suspect had left Oakland Park in a new, gray, compact two-door car, with seven other individuals.  The car the officers stopped was an older, dark, four-door with four occupants. The second (anonymous) caller's description of the young woman who allegedly handed the gun to the shirtless, almost bald man, also suffers from questionable reliability.   She did not explain how she knew the age of the young woman who handed the armed man a gun, and she did not provide Rose with other information that he could or did use to corroborate her reliability.

 Neither caller relayed information about an ongoing emergency. At the time the anonymous caller provided a description of the young woman, the first caller had already reported that the shirtless, almost bald man with the gun left Oakland Park in a compact, light two-door. No caller claimed that the man gave the gun back to the young woman.  There was no

ORDER
PAGE - 8

reason for the officers to suspect that the young woman might still have possession of the weapon, or that the man she gave it to was in the car.

Even if the anonymous 9-1-1 call had the requisite indicia of reliability, a reasonable jury could nevertheless conclude that the calls did not create a reasonable suspicion that criminal activity was afoot. Neither call indicated that Zechariah or any of the car occupants were engaged in criminal activity.  Although one of the occupants matched the description of the young woman reported by the anonymous caller, reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272. And even if the anonymous caller's report supports finding that the young woman who matched the caller's description was previously engaged in criminal activity (possessing a hand gun), this is not a basis to suspect Escalante or the other occupants of anything. Aside from confirming the "large brawl" and the dispersal of several people in four vehicles, the in-park witness did not provide information to establish a particularized and objective basis to suspect car's occupants of wrongdoing.

Viewing the facts in the light most favorable to Zechariah, a reasonable jury could therefore find that the *Terry* stop was unconstitutional because it was not based on a particularized, reasonable suspicion of criminal activity in the totality of the circumstances. Rose and Miller are not entitled to summary judgment on Zechariah's Fourth Amendment investigatory stop claim. For the same reason, Rose and Miller are not entitled to qualified immunity on this claim; it is clearly established that, absent reasonable suspicion, police officers may not conduct investigatory stops.

The Motion for Summary Judgment on the *Terry* stop claim is DENIED.

ORDER
PAGE - 9

**D. Excessive Force Claim.**

Escalante claims that the officers violated his Fourth Amendment rights when they detained and ultimately tased and arrested him. The officers claim that their actions—based on his delay in exiting the car, his "target glance," and his reaction when they took him down—made their actions "objectively reasonable as a matter of law."

The excessive force analysis involves three steps. Courts must first "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). Here, the degree of intrusion faced by Zechariah could be classified as severe. *See Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) (degree of intrusion "severe" where plaintiff was ordered out of her vehicle at gunpoint, forced to her knees, and handcuffed). Even though Zechariah did not match the description of any suspect and the car did not match the description of the car the suspect entered, viewed in the light most favorable to him, he was ordered out of the vehicle at gunpoint, forced to get on his knees, slammed against the pavement, kicked, kneed, tased, handcuffed, and arrested.

Second, the reviewing court must "evaluate the government's interest in the use of force." *Id.* At a minimum, three factors inform the government's interest: "(1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Lal v. California*, 746 F.3d 1112, 1117 (9th Cir. 2014). The most important of these three factors is whether a suspect posed an immediate threat to the safety of the officers or others. *Id.*; *Glenn*, 673 F.3d at 872. If these factors do not support a need for force, "'*any* force

ORDER
PAGE - 10

used is constitutionally unreasonable.'" *Green*, 751 F.3d at 1049 (quoting *Lolli v. Cnty. of Orange*, 351 F.3d 410, 417 (9th Cir. 2003)).

A reasonable jury could find the factors considered in determining the government's interest in the use of force weigh in Zechariah's favor. The severity of the crime at issue was low. Even assuming one of the young women in the Escalante Vehicle matched a description given by the anonymous 9-1-1 caller, the officers were potentially only dealing with a charge for a minor-in-possession of a weapon. Any claim that this crime was ongoing is undermined by the reports themselves, indicating the young woman no longer possessed the weapon by the time Rose and Miller encountered and stopped the Escalante vehicle. While the woman had potential involvement in the Oakland Park fight, Rose and Miller had literally no basis for believing that Zechariah was involved in any crime or criminal activity. Escalante did not match the 9-1-1 callers' description of the armed man, the car did not match, and the number of occupants did not match.

It is far from objectively clear that Zechariah posed any, much less an immediate, threat to the safety of officers. A jury might find that Zechariah looked back with a "target glance" indicating his intention to fight or flee, but the Court would have to view the evidence in the light most favorable to the moving defendants to so determine on summary judgment.

The same is true with the claim that Escalante refused to comply with orders, and actively resisted the arrest efforts of three police officers. Indeed, a jury could find that there was no basis whatsoever for arresting Zechariah, or for taking him down, or for tasing[5] him.

---

[5] The court is also not swayed by Rose and Miller's reliance on an electronic control tool report to dispose of Zechariah's Fourth Amendment excessive use of force claim. *See* Dkt. #37 at 17-19. The electronic control tool report indicates that Miller only tased Zechariah one time. *See* Dkt. #37 at 18-19. Zechariah challenges all of Rose and Miller's use of force against him, not just Miller's use of the taser. *See* Dkts. #1 ¶17 and #49 at 23-25. Even if Miller tased Zechariah only once, he is not entitled to summary judgment. Defendants' claim that tasing was not

Escalante insists he followed all of Rose's commands and claims his hands were behind his head at all times. Whether an unarmed 130-pound youth, who did not match the description of any suspect sought by the officers, posed a threat to them, or could not be controlled by them, is a question of fact for the jury.

In the third step of the excessive force analysis, courts "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.* A reasonable jury could conclude Rose and Miller's intrusion on Zechariah's Fourth Amendment interests was not justified. Viewed in the light most favorable to him, Escalante has made out a viable constitutional claim. For the same reasons—and because the reasonableness of the force used on disputed facts is generally not subject to summary adjudication—the officers' claim of qualified immunity on this claim is DENIED.

**E.  State Law Claims.**

Escalante asserts state law claims under the state Constitution and for and negligently conducting an investigatory stop and using of excessive force. Defendants seek summary judgment on the state constitutional claims because claims for monetary damages under the Washington State Constitution are not cognizable. They seek dismissal of the negligence claim because Washington State's public duty doctrine forecloses it.

*a.   State Constitutional Claims.*

Escalante does not respond to the argument that a state constitutional violation does not and cannot support an award of money damages.  But the argument is accurate: the Washington Supreme Court has not recognized civil claims for violations of the Washington State Constitution. *See Blinka v. Wash. State Bar Ass'n*, 36 P.3d 1094, 1102 (Wash. Ct. App. 2001)

---

"clearly established" to be unconstitutional on the facts of this case until weeks after the incident assumes, incorrectly, that their version of those facts is accurate as a matter of law.

ORDER
PAGE - 12

(upholding dismissal of state constitutional causes of action where Washington State courts have refused to recognize a private cause of action for alleged state constitutional violations). The Motion for Summary Judgment on Escalante's Article I, Section 7 claim is GRANTED and that claim is DISMISSED with prejudice.

b.   *Negligence*

Escalante also asserts a common law negligence claim, arguing the officer negligently stopped arrested and used excessive force on him. The defendants argue the public duty doctrine bars these claims as a matter of law. They claim police officers do not owe individual members of the public any actionable duty.

Local governmental entities are liable for damages that arise out of their tortious conduct "to the same extent as if they were a private person or corporation." WASH. REV. CODE § 4.96.010(1). Local entities and their agents are not immune from negligence claims. *See Washburn v. City of Federal Way*, 310 P.3d 1275, 1287 (Wash. 2013) The public duty doctrine does not apply to claims of negligence premised on a police officer's alleged *mis*feasance, as opposed to *non*feasance. While the public duty doctrine is properly used to shield police officers for their alleged failure to perform statutory duties—typically, protecting citizens from harm *by third parties*—the doctrine is not properly used to shield officers from their *own* tortious conduct. *See, e.g.*, *Washburn*, 310 P.3d at 1291 ("We have long recognized that where a municipal entity owes a duty to specific individuals, it must not discharge this duty negligently."); *also Coffel v. Clallam County*, 735 P.2d 686, 690 (Wash. App. 1987) ("The [public duty] doctrine provides only that an individual has no cause of action against law enforcement officials for failure to act. Certainly, if the officers do act, they have a duty to act with reasonable care."). *See also Munich v Skagit Emergency Comm. Ctr.* 288 P.3d 328 (2012).

ORDER
PAGE - 13

Taken to its logical extreme, the defendants' argument is that officers cannot be negligent, and that one injured by an officer's misfeasance—say, speeding through a busy crosswalk—has no claim as a matter of law, because the duty not to so speed is owed to the public at large.  There is no support for that position. The public duty doctrine does not bar Escalante's negligence claim.

The Defendants' better argument is that Escalante does not really assert a negligence claim against the officers; if their conduct was wrongful, it would support an intentional tort claim for assault or battery, not a negligence claim.

To state claims for negligence, Plaintiffs' complaint must allege facts showing Defendants committed an intentional breach of a legal duty, that Defendants breached that duty, that the breach resulted in injury, and that breach of the duty owed was the proximate cause of the injury sustained. *See Hartley v. State*, 698 P.2d 77, 82 (Wash. 1985); *see also Mcleod v. Grant County Sch. Dist. No. 128*, 255 P.2d 360, 362 (Wash. 1953). Duties "may be predicated on violation of either a statute or common law principles of negligence." *Alhadeff v. Meridian on Bainbridge Island, LLC*, 220 P.3d 1214, 1222 (Wash. 2009) (citing *Bernethy v. Walt Failor's, Inc.*, 653 P.2d 280 (Wash. 1982)).

Escalante's negligence claims are premised on Defendants' unlawful investigatory stop and their use of excessive force. To succeed on the §1983 versions of these claims, Escalante must establish that the Defendants acted *intentionally. See*  Ninth Circuit Model Jury Instructions Nos. 9.11, 9.19, 9.20, and 9.23; *see also Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (defining a Fourth Amendment seizure as "a governmental termination of freedom of movement *through means intentionally applied*") (emphasis in original). Indeed, negligence cannot support

ORDER
PAGE - 14

a constitutional claim. *See Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002) ("negligent acts do not incur constitutional liability").

Because negligence claims cannot be based on an intentional breach of a legal duty, Plaintiffs cannot maintain negligence claims for Rose and Miller's alleged unlawful investigatory stop, or for their alleged use of unnecessary and improper force. *See*, *Boyles v. City of Kennewick*, 813 P.2d 178, 179 (Wash. Ct. App. 1991) ("Generally, a police officer making an arrest is justified in using sufficient force to subdue a prisoner, however he becomes a tortfeasor and is liable as such *for assault and battery* if unnecessary violence or excessive force is used in accomplishing the arrest.") (emphasis in original); *see also Rengo v. Cobane*, No. C12-298 TSZ, 2013 WL 3294300 at *2 (W.D. Wash. June 28, 2013) (acknowledging that plaintiffs must demonstrate that defendant acted intentionally in order prevail on a §1983 claim for unlawful seizure). Escalante's negligence claims against Rose and Miller are therefore fatally flawed and the Defendants' Motion for summary Judgment on them is **GRANTED**.

Escalante's negligence claims against the City of Tacoma is also flawed. The complaint appears to allege that the City owed a general duty of care that it breached by failing to provide proper training, policies, and procedures for officers to follow when investigating 9-1-1 calls and when conducting searches and seizures[6]. The Escalantes have not established the duty of care owed to them by the City. A city's duty to train its police officers is owed to the public at large, and Plaintiffs do not make an attempt to establish how that duty was owed to them as individuals. *See Shope v. City of Longwood*, No. C10-0256RSL, 2011 WL 1154447, at *6 (W.D. Wash. Mar. 28, 2011) ("The duty of the City to hire, train, retain, and supervise its officers is owed to the public at large, not to plaintiff individually."). Escalante's negligence claims against

---

[6] These allegations, supported by sufficient evidence, might support a *Monell* claim against the City, but Escalante does not assert such a claim.

ORDER
PAGE - 15

the City thus fail as a matter of law. The City's Motion for Summary Judgment on that claim sis GRANTED and it is DISMISSED.

The final issue is Plaintiff Lynnda Escalante's Wash. Rev. Code § 4.24.010 negligence claim. This claim is necessarily based on Defendants' negligent acts. In the absence of a viable negligence claim, this claim claim fails as a matter of law. It is DISMISSED.

## IV.    CONCLUSION

1.  Defendants' Motion is GRANTED IN PART and DENIED IN PART.

2.  Zechariah's Fourth Amendment claims against Rose and Miller shall proceed to trial.

3.   Plaintiffs' state-law constitutional claims against Rose, Miller, and John Does 1-5 are DISMISSED.

4.  Plaintiffs' negligence claims against Rose, Miller, and John Does 1-5 are DISMISSED.

5.  Plaintiffs' negligence claims against City of Tacoma are DISMISSED.

6.  Plaintiff Lynnda Escalante's negligence claim is DISMISSED.

IT IS SO ORDERED.

DATED this 19th day of December, 2016.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 16